UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Tammy Jo Brook,<br><br>                Plaintiff,<br><br>v.<br><br>Carolyn Colvin,<br>Commissioner of Social Security,<br><br>                Defendant. | Civil No. 14-813 (DWF/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Carol Louise Lewis, Attorney at Law, 14 North Seventh Avenue, Saint Cloud, MN 56303, for Plaintiff.

Pamela Marentette, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.

HILDY BOWBEER, United States Magistrate Judge

## I.     Introduction

Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for a period of disability and disability insurance benefits. This matter is now before the Court on the parties' cross motions for summary judgment. (Pl.'s Mot. Summ. J. [Doc. No. 16]; Def.'s Mot. Summ. J. [Doc. No. 18].) This matter has been referred to the undersigned United States Magistrate Judge for Report and Recommendation (R&R) under 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends denying Plaintiff's motion and granting Defendant's motion.

## II.     Background

### A.     Procedural Background

Plaintiff filed an application for a period of disability and disability insurance benefits on February 14, 2011, alleging a disability onset date of August 1, 2004. (R. 10.)[1] Plaintiff alleges disability based on trigeminal neuralgia, migraines, chiari malformation, fibromyalgia, plantar fasciitis, back pain, and restless leg syndrome. (R. 166-67.) The Social Security Administration (SSA) denied Plaintiff's claims initially on May 13, 2011, and upon reconsideration on June 22, 2011. (R. 10.) On August 9, 2011, Plaintiff filed a written request for hearing. (R. 10.) On October 5, 2012, Plaintiff testified in a hearing before the Administrative Law Judge (ALJ), who denied Plaintiff's claim on November 27, 2012. (R. 17, 22-48.) Plaintiff sought review of the ALJ's decision, and the Appeals Council denied review on February 14, 2014. (R. 1-4.)

### B.     Factual Background and Past Employment

Plaintiff was born in 1959 and has a high school education. (R. 16.) From 1989 until August of 2004, Plaintiff worked at her father's used car business, helping him prepare titles for the vehicles. (R. 149.) From 2005 to the present, Plaintiff has received royalty checks for a product she invented. (R. 26, 149.)

On March 20, 2011, Plaintiff completed a function report for the SSA. (R. 166-73.) At that time, Plaintiff's activities included making breakfast, light housekeeping, walking exercises if she was able, and watching television. (R. 167.) Almost every day, Plaintiff also read and played board and card games. (R. 170.) Plaintiff indicated that

---

[1] The Social Security Administrative Record ("R.") is available at Doc. No. 12.

her conditions affected her abilities to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and complete tasks. (R. 171.) Her abilities to reach, talk, hear, see, remember, concentrate, understand, follow instructions, use her hands, and get along with others, however, were unaffected. (R. 171.)

### C. Medical Records[2]

On January 11, 2006, Plaintiff visited St. Cloud Hospital in St. Cloud, Minnesota, reporting facial and teeth pain. (R. 244.) John Mertz, M.D., Ph.D., noted Plaintiff's prior diagnosis for trigeminal neuralgia and treatment with Tegretol, which did not provide much relief. (R. 244.) Examination showed that Plaintiff did not really have any tenderness over her teeth, but had a significant amount of facial pain. (R. 244.) Dr. Mertz diagnosed Plaintiff with "most likely trigeminal neuralgia" and treated her with narcotics, droperidol, and Benadryl. (R. 244.)

On January 31, 2006, Plaintiff visited St. Cloud Ear, Nose, and Throat (ENT) in St. Cloud, Minnesota, complaining of vertigo. (R. 210.) Douglas Liepert, M.D., noted that Plaintiff's dizziness had been a problem for two weeks, and was associated with nausea, vomiting, and loss of consciousness. (R. 210.) That same day, B. Brindley, M.D., at the St. Cloud Hospital issued Plaintiff's MRI results, which showed a mild form of chiari malformation. (R. 289.)

On February 8, 2006, Plaintiff visited St. Cloud ENT, where Theodore Truitt,

---

[2] The Court sets forth the medical records cited by Plaintiff and certain medical records cited by the ALJ. Defendant adopted the ALJ's recitation of the medical facts. (Def.'s Mem. Supp. Mot. Summ. J. at 2 [Doc. No. 19].) The parties' motions focus on Plaintiff's headaches and trigeminal neuralgia.

M.D., diagnosed her with sensorineural hearing loss and chiari malformation. (R. 207-09.) Dr. Truitt noted that her condition began with "more severe vertigo followed by intermittent episodes and unsteadiness." (R. 209.) Plaintiff reported feeling as if she were "getting somewhat better." (R. 209.) Dr. Truitt prescribed Cawthorne exercises to reinforce the associations between Plaintiff's balance mechanism and her eyes, and asked her to return if she did not feel better in three months. (R. 209.)

On April 11, 2006, Plaintiff visited Thomas Falloon, M.D., at the Centra Care Clinic in St. Cloud, Minnesota, reporting her recent history of trigeminal neuralgia, for which Neurontin helped resolve most of her pain. (R. 282.) Plaintiff also reported a long history of migraine headaches, suboccipital pain, and aggravation of her symptoms when she bent her head forward, coughed hard, or did sit-ups. (R. 282.) Dr. Falloon reviewed Plaintiff's MRI scan with her, discussed the pathophysiology of chiari malformation, and addressed the potential need for a chiari decompression in the future. (R. 283.)

On September 14, 2006, Plaintiff visited Sharon Ruggiero, M.D., at the Centra Care Clinic. (R. 270.) Plaintiff reported that since taking Neurontin, she had no significant issues with the trigeminal neuralgia. (R. 270.) She also reported frequent migraines—bad spells of five or six days in a row, which would then subside—but found Imitrex to help. (R. 270.)

On July 25, 2007, Plaintiff visited Dr. Ruggiero again. (R. 267.) Plaintiff reported chronic daily headaches and taking as much Imitrex as her insurance would cover. (R. 267.) Since taking Neurontin, Plaintiff noticed that her headaches were not worsening. (R. 267.) Dr. Ruggiero told Plaintiff that daily Imitrex was "not a wise

4

solution," and considered prescribing Plaintiff Toprol-XL, and perhaps Topomax if the Toprol-XL did not help. (R. 268.) Dr. Ruggiero believed that some, but not necessarily all, of Plaintiff's headaches were migraines, and the trigeminal neuralgia potentially exacerbated them. (R. 268). Plaintiff was to follow up with Dr. Ruggiero in several months, or sooner if her headaches did not improve. (R. 268.)

On October 25, 2007, Plaintiff visited Rickey Reynolds, M.D., Ph.D., at the Centra Care Clinic. (R. 281.) Dr. Reynolds noted that Plaintiff was taking Neurontin for her trigeminal neuralgia with good results, and daily Imitrex and Vicodin for her headaches. (R. 281.) Dr. Reynolds strongly discouraged Plaintiff from using Imitrex and Vicodin daily. (R. 281.) He asked her to follow up with Dr. Ruggiero for the headaches and Dr. Falloon for the chiari malformation. (R. 281.)

On November 6, 2007, Plaintiff met with Dr. Falloon about her chiari malformation, which was causing increased neck and shoulder pain on her right side. (R. 280.) Plaintiff additionally reported continued headaches, which responded to Imitrex and Vicodin on an as-needed basis. (R. 280.) Dr. Falloon found Plaintiff's symptoms "pretty similar" to what she had documented previously, and told Plaintiff she was a candidate for cranial cervical decompression. (R. 280.)

On September 3, 2008, Plaintiff visited Dr. Ruggiero for her annual exam. (R. 257.) Plaintiff reported having more problems with her headaches, which occurred daily, began with muscle tightness in her neck, and expanded into her head. (R. 257). Plaintiff found Imitrex helpful. (R. 257.) Dr. Ruggiero did not change her medication, but encouraged Plaintiff to reduce the use of Imitrex and pain medication. (R. 258.)

5

Dr. Ruggiero also discussed different medications for Plaintiff's trigeminal neuralgia, such as Tegretol, but for the time being, Plaintiff would reduce her dose of Neurontin. (R. 258.)

On January 8, 2010, Plaintiff visited Dr. Ruggiero for her annual exam, reporting her continued struggle with headaches. (R. 253.) Dr. Ruggiero assessed her headaches as "multifactorial with components for migraines, trigeminal neuralgia, chiari malformation, and probably medication overuse," and prescribed Toprol-XL. (R. 255.) They discussed the appropriate use of medications. (R. 255.) Dr. Ruggiero additionally started Plaintiff on a steroid inhaler for her mild persistent asthma. (R. 255.) Dr. Ruggiero further noted Plaintiff's lipomas, for which no treatment was needed. (R. 255.)

On November 3, 2010, Plaintiff was advised of the results of her cervical spine MRI. (R. 333.) Dr. Ruggiero noted that the chiari malformation was unchanged and not likely the cause of her neck and head pain. (R. 333.) Dr. Ruggiero recommended physical therapy, unless the muscle relaxer previously prescribed had resolved her pain already. (R. 333.)

On November 12, 2010, Plaintiff visited neurologist Kathleen Rieke, M.D., at Centra Care Clinic, who noted Plaintiff's complaints of neck pain, migraines, and trigeminal neuralgia. (R. 360-61.) Plaintiff reported taking Flexeril for the neck pain, which she found helpful. (R. 361.) Plaintiff described her migraines as "pounding-type pain" that occurred anywhere in her head, and usually stayed in one spot. (R. 361.) Because her migraines had escalated and occurred daily, Plaintiff was taking Metoprolol,

which she started at 25 milligrams daily but had increased to 50 milligrams daily. (R. 361.) With this prescription, Plaintiff noticed the migraines were less frequent and less severe. (R. 361.) Plaintiff reported taking Imitrex about once per week. (R. 361.) As for the trigeminal neuralgia, Plaintiff reported a "burning pins-and-needles-type sensation" in her left cheek, causing pain when she brushed her teeth on that side or had any dental work performed. (R. 361.) For this condition, Plaintiff took gabapentin three times per day, which she found very helpful. (R. 361.) Dr. Rieke recommended continuing Flexeril for the neck pain, continuing Metoprolol of 50 milligrams daily and Imitrex for the migraines, and continuing gabapentin and trying Magic Mouthwash for the trigeminal neuralgia. (R. 362.) Dr. Rieke expected to see Plaintiff again in six weeks. (R. 362.)

On May 10, 2011, and June 21, 2011, state agency medical consultants, Steven Richards, M.D. and Charles Grant, M.D., respectively reviewed Plaintiff's medical records and completed a physical residual functional capacity (RFC) assessment. (R. 53-56, 59-64.) Both found that Plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand, walk, and/or sit for a total of six hours in an eight-hour workday; and did not have limitations in pushing and pulling, except for the lifting and carrying limitations set forth. (R. 55, 63.) Of Plaintiff's postural limitations, she could occasionally climb ladders, ropes, and scaffolds, but was otherwise not limited. (R. 55-56, 63-64.) As for Plaintiff's environmental limitations, Plaintiff was to avoid even moderate exposure to hazards, such as machinery and heights. (R. 56, 64.) Both concluded that Plaintiff was not disabled for the relevant period of

August 1, 2004, through June 30, 2010.  (R. 58, 66.)

On September 23, 2011, Plaintiff visited Dr. Ruggiero, primarily complaining of her daily headaches.  (R. 346.)  Plaintiff stated that she took as much Imitrex as she could, and on days without Imitrex, took Excedrin for her migraines.  (R. 346.)  Plaintiff reported that Metoprolol used to work, but no longer seemed to help.  (R. 346.)  Dr. Ruggiero noted that Plaintiff last saw her neurologist approximately a year ago and was supposed to return in six weeks, but never arranged an appointment.  (R. 346.)

### D. Testimony at the Administrative Hearing

#### 1. Plaintiff's Testimony

At the hearing on October 5, 2012, Plaintiff testified that she graduated from high school.  (R. 26.)  According to Plaintiff, she worked for her father's business until the company went out of business in 2004, and from 2005 until the present, Plaintiff received approximately $95 in royalties each year for her invention.  (R. 27-28.)  Plaintiff attributed her inability to work since 2004 through June 30, 2010, primarily to her migraines, but also to her trigeminal neuralgia and sciatica.  (R. 29-37.)  For her migraines, Plaintiff reported taking Vicodin, Imitrex, Migranal, and Neurontin.  (R. 31.)  Plaintiff rated her migraine pain as a maximum of eight or nine, and a minimum of two or three, on a ten-point scale.  (R. 40.)

Plaintiff described her daily routine as mostly sitting in her chair, using the computer and playing games, reading the newspaper, and sitting outside in nice weather.  (R. 38.)  Plaintiff lived with her daughter and grandchildren, the latter with whom she would do coloring activities.  (R. 39.)  Plaintiff reported driving herself to the doctor and

8

shopping for groceries periodically. (R. 37-38.) She also cooked simple meals and folded laundry. (R. 38.)

### 2. Medical Expert's Testimony

An impartial medical expert, Dr. Andrew Steiner, testified at the hearing. (R. 41-44.) He identified the following impairments for Plaintiff: mild persistent asthma, migraines and chronic headaches, trigeminal neuralgia, chiari malformation, plantar fasciitis, fibromyalgia, a history of finger fractures, high frequency hearing loss, and chronic obstructive pulmonary disease (COPD). (R. 42-43.) Dr. Steiner opined that none of these impairments met or medically equaled a listed impairment. (R. 43.) He believed the impairments resulted in the following work-related limitations: light RFC as far as lifting and time on feet, not working at unprotected heights and with hazardous machinery, and not working in environments with high concentrations of air pollutants. (R. 43-44.)

### 3. Vocational Expert's Testimony

Next, an impartial vocational expert, Beverly Solyntjes, testified. (R. 44-47.) The ALJ asked Ms. Solyntjes to assume a hypothetical fifty-one year old individual with a high school education, suffering from obesity, asthma, headaches, chiari malformation, plantar fasciitis, high frequency hearing loss, depression, and trigeminal neuralgia. (R. 45.) The ALJ specified that this hypothetical individual was limited to light work, lifting up to twenty pounds occasionally and ten pounds frequently, and six hours of standing or walking and two hours of sitting in an eight-hour workday. (R. 45.) The ALJ additionally restricted this individual from working at unprotected heights and near

hazards, and from exposure to high concentrations of air pollutants. (R. 46.) The ALJ further limited this individual to routine, repetitive, and simple work, in light of her depression and headaches. (R. 46.) Ms. Solyntjes opined that such a person could not do any of Plaintiff's past relevant work, but could perform other jobs in the national economy, such as bench assembler, buffing machine tender, and collator operator tender. (R. 46.)

### E. The ALJ's Findings and Decision

On November 27, 2012, the ALJ concluded that between August 1, 2004 (the alleged onset date), through June 30, 2010 (the date last insured), Plaintiff was not disabled. (R. 17.) In reaching this conclusion, the ALJ followed the five-step evaluation set forth in the Code of Federal Regulations.[3] *See* 20 C.F.R. § 404.1520(a).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date and her date last insured. (R. 12.) Although Plaintiff reported self-employment from 2005 to the present based on royalties received for her invention, the ALJ found the annual earnings of approximately $95 did not rise to

---

[3] The United States Court of Appeals for the Eighth Circuit has summarized the five-step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998) (citation omitted).

the level of substantial gainful activity.  (R. 12.)

At step two, the ALJ found that Plaintiff had the severe impairments of obesity, asthma/COPD, multifactorial headaches with trigeminal neuralgia, and mild high frequency hearing loss with associated vertigo.  (R. 12.)  The ALJ also noted Plaintiff's non-severe physical impairments, including chiari deformity, plantar fasciitis, and finger fractures.  (R. 12-13.)  There was no evidence of depression during the relevant period.  (R. 13.)  The ALJ further noted that there were impairments diagnosed after the date last insured, including fibromyalgia, which were not relevant to the decision.  (R. 13.)

At step three, the ALJ concluded that none of Plaintiff's impairments met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1,[4] which was consistent with the medical expert's testimony at the October 5, 2012, hearing.  (R. 13.)  The ALJ found that Plaintiff had the RFC to "perform light work," as defined in 20 C.F.R. 404.1567(b), "except which does not require work at unprotected heights or near hazards or exposure to high concentrations of air pollutants, and which is routine, repetitive simple work."  (R. 13.)  The ALJ found Plaintiff's allegations credible that she would have difficulty with strenuous physical activity, and reduced her RFC accordingly.  (R. 14.)  The ALJ further reduced the RFC to accommodate limitations from Plaintiff's dizziness, and limited her to routine, repetitive simple work to accommodate the headaches and pain.  (R. 14.)  The ALJ did not find credible, however, Plaintiff's allegations that she was incapable of all work based on significant inconsistencies in the

---

[4] An impairment is medically equivalent under the regulations if it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404.1526(a).

record. (R. 14.) These inconsistencies included infrequent treatment for headaches and the trigeminal neuralgia, and Plaintiff's general satisfaction with the treatment she was receiving. (R. 14.) The ALJ considered Plaintiff's daily activities and work history as well. (R. 15.) As for the opinion evidence, the ALJ placed the greatest weight on the medical expert's opinion and testimony, based on his specialization in physical medicine and rehabilitation, familiarity with the disability evaluation process, and opportunity to review Plaintiff's entire medical record. (R. 15.) The ALJ gave only some weight to the state agency medical consultants, because they were not able to review the record as it existed at the hearing level. (R. 15.)

At step four, the ALJ determined that through June 30, 2010, Plaintiff could not perform her past relevant work as an office clerk. (R. 16.)

At step five, the ALJ considered the vocational expert's testimony and found jobs existing in significant numbers in the national economy that Plaintiff could have performed, such as bench assembler, buffing machine tender, and collator operator tender. (R. 16-17.) Therefore, the ALJ concluded that Plaintiff was not disabled, as defined by the Social Security Act, from August 1, 2004, through June 30, 2010. (R. 17.)

### III. Discussion

#### A. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."

*Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome, or even if the Court would have granted benefits.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  If it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

### B.    Plaintiff's Claims

Plaintiff argues that contrary to the ALJ's findings, her impairments meet or medically equal a listed impairment, and Plaintiff is not able to do other work considering her RFC, age, education, and work experience.  For the latter finding, Plaintiff argues the ALJ posed a deficient hypothetical question to the vocational expert.

#### 1.    Plaintiff's Impairments

Plaintiff challenges the purported failure of the medical expert and the ALJ to address her headaches and trigeminal neuralgia.  Plaintiff also challenges the ALJ's failure to consider whether Plaintiff's symptoms met or medically equaled Listing 11.03.  Plaintiff further argues that the ALJ failed to properly develop the record with respect to her headaches and trigeminal neuralgia.  The Court disagrees with all of these grounds.

First, the record shows that the medical expert addressed Plaintiff's headaches and trigeminal neuralgia.  At the October 5, 2012, hearing, the ALJ asked Dr. Steiner to

identify the medically determinable impairments that were established on or before June 30, 2010. (R. 42.) Dr. Steiner replied in part:

> Obesity is mentioned in 7F3; mild persistent asthma, for which she was hospitalized in September of '07, 2F4 and 8F2; *migraine headaches chronic in nature, or headaches chronic in nature, described as multifactorial*, 3F4 and 3F9 and 8F19, *with some association with a condition called trigeminal neuralgia*, which was present since September of 2010, I believe. I—September or—I'll have to go back—8F2 would be first to—this was a chronic problem during that time period. It was said to be generally under good control in September of '07, 2F page 15, but became more marked more recently, according to 9F9. The—it is treated with medications and may be contributing to her headache problem, according to this record.

(R. 42) (emphases added). As for whether the ALJ asked about Plaintiff's headaches, the hearing transcript shows that immediately after Dr. Steiner set forth these impairments, which included headaches, among others, the ALJ solicited Dr. Steiner's opinion on whether Plaintiff was "subject to any impairment or combination of impairments which would either meet or medically equal any of the relevant listings." (R. 43.) Thus, the medical expert and ALJ did not overlook Plaintiff's headaches and trigeminal neuralgia at the hearing.

Second, the ALJ's decision not to consider Plaintiff's impairments under Listing 11.03 was not error. Listing 11.03 applies to "Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.03. There is no medical evidence that Plaintiff had epilepsy or seizures. And, Plaintiff concedes there is no medical source stating that the limiting effects of Plaintiff's

14

obesity, asthma/COPD, trigeminal neuralgia, mild high frequency hearing loss with associated vertigo, and carpal tunnel syndrome are of equal medical significance to the criteria in Listing 11.03. (Pl.'s Mem. at 14 [Doc. No. 17].) Although an ALJ should address a listing if the record "raise[s] a substantial question as to whether [the claimant] could qualify as disabled" under that listing, she is not required to discuss listings that the applicant clearly does not meet, "especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). The record here does not raise a substantial question about whether Plaintiff could qualify as disabled under Listing 11.03, and Plaintiff did not raise the listing before the ALJ. Therefore, the Court concludes that the ALJ was not required to consider Plaintiff's impairments under Listing 11.03.

Third, Plaintiff argues that the ALJ failed to properly develop the record regarding her headaches and trigeminal neuralgia, and at a minimum, should have submitted interrogatories to the medical expert on these impairments. This argument, however, mischaracterizes the ALJ's burden, whose duty to develop the record is not infinite. *See McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) ("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."). Here, the ALJ had sufficient medical evidence about Plaintiff's headaches and trigeminal neuralgia to find that she was not disabled. Based on the following treatment records, the ALJ found "infrequent treatment" for these impairments and "general satisfaction with the treatment she was receiving":

- **September 14, 2006**: Plaintiff reported no significant issues with trigeminal neuralgia since starting Neurontin, and she was taking up to eighteen Imitrex per month.

- **July 25, 2007**: Plaintiff reported taking as many Imitrex as possible and was advised to try Toprol.

- **October 25, 2007**: Plaintiff reported good results with Neurontin for her trigeminal neuralgia and was discouraged from taking Imitrex daily for her headaches.

- **September 4, 2008**: Plaintiff reported some relief from Imitrex and did not want to change her migraine medication. Plaintiff indicated her willingness to consider a different medication for the trigeminal neuralgia.[5]

- **January 8, 2010**: Plaintiff was advised that her headaches were multifactorial and included probable medication overuse. Plaintiff was advised on the appropriate use of medication and told to start Toprol daily.

(R. 14-15.) These treatment records are accurately summarized in the ALJ's decision and consistent with her findings. Although the ALJ did not identify certain medical visits that are set forth in this R&R and documented in the record, treatment notes from those visits are also consistent with the ALJ's findings. Thus, the Court concludes the ALJ had sufficient medical evidence to determine whether Plaintiff was disabled on the basis of her headaches and trigeminal neuralgia, and the ALJ met her duty to develop the record.

Relatedly, Plaintiff argues that the ALJ failed to follow Social Security Rule (SSR) 96-6p by not ensuring the medical expert's opinion included all of Plaintiff's symptoms. This argument, however, misinterprets SSR 96-6p, which requires an ALJ to obtain an updated opinion of a medical expert if additional medical information,

---

[5] The treatment notes for this visit show that while they were updated on September 4, 2008, Plaintiff's visit occurred on September 3, 2008. (R. 257.)

introduced to the record after the state agency consultants' review, challenges their opinion that the impairment is not equivalent in severity to a medical listing. *See Piper v. Astrue*, No. 06-3802 (PAM/RLE), 2008 WL 3368907, at *16 (D. Minn. Aug. 8, 2008). Plaintiff does not identify any additional information that so challenges the state agency consultants' opinions. Of the medical records that post-date the state agency consultants' assessments, there is no evidence suggesting Plaintiff was disabled during the relevant time period. For these reasons, the Court finds that the ALJ did not violate SSR 96-6p.

### 2.     Hypothetical Question to Vocational Expert

Plaintiff argues that the ALJ posed a deficient hypothetical question to the vocational expert, and therefore the vocational expert's opinion was not a basis to deny Plaintiff's application for benefits. The Court disagrees.

A vocational expert's testimony constitutes substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *McKinney v. Apfel*, 228 F.3d 860, 865 (8th Cir. 2000). The hypothetical question need not include all of the impairments alleged by the claimant, but "need only include impairments that are supported by the record and which the ALJ accepts as valid." *Id.*; *see also Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (hypothetical question must only include the impairments the ALJ finds actually exist, assuming the ALJ's findings are supported by substantial evidence on the record as a whole).

The Court has reviewed the hypothetical question posed to Ms. Solyntjes. The ALJ first identified Plaintiff's impairments, namely obesity, asthma, headaches, chiari

deformity, plantar fasciitis, high frequency hearing loss, depression, and trigeminal neuralgia. (R. 45.) Next, the ALJ asked Ms. Solyntjes to assume the following limitations for the hypothetical individual:

> I want you to assume the claimant would be limited to light work exertionally, lifting up to 20 pounds occasionally, 10 pounds frequently; six hours of standing or walking, two hours of sitting in an eight-hour workday; that would be further restricted by no work at unprotected heights or near hazards; the work should not involve exposure to high concentrations of air pollutants; and because of the depression and the headaches, I would further limit this individual to routine, repetitive, simple work. Given those limitations, could this individual perform any of the jobs done by the claimant in the past?

(R. 45-46.) These limitations are consistent with the RFC offered by the medical expert, Dr. Steiner, who believed "the record would tend to support a light residual as far as lifting and time on feet," and "the history of vertigo and hearing loss would preclude working at unprotected heights and with, with hazardous machinery. The asthma would preclude working in environments with high concentrations of air pollutants." (R. 44.) Notably, the ALJ added limitations unidentified by Dr. Steiner, in order to account for Plaintiff's depression and headaches: "I would further limit this individual to routine, repetitive, simple work." (R. 46.) Since the ALJ identified Plaintiff's headaches and trigeminal neuralgia, among other impairments, and then placed additional limitations on the hypothetical individual beyond what Dr. Steiner opined, the Court concludes that the ALJ's question to Ms. Solyntjes about the hypothetical individual was not flawed. Consequently, Ms. Solyntjes's testimony constituted substantial evidence on which the ALJ could base her decision.

**IV.     Recommendation**

Based on the foregoing and all of the files, records, and proceedings herein, the Court finds there is substantial evidence on the record as a whole to support the ALJ's conclusion that Plaintiff is not disabled under the Social Security Act.  Accordingly,

**IT IS RECOMMENDED THAT**:

1. Plaintiff's Motion for Summary Judgment [Doc. No. 16] be **DENIED**;

2. Defendant's Motion for Summary Judgment [Doc. No. 18] be **GRANTED**; and

3. Judgment be entered accordingly.


Dated:  March 6, 2015                    s/ *Hildy Bowbeer*
                                         HILDY BOWBEER
                                         United States Magistrate Judge


**NOTICE**

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **March 23, 2015**, a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a *de novo* determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.